MIAMI COPPER CO. v. MINERALS SEPARATION, Limited.

MINERALS SEPARATION, Limited, v. MIAMI COPPER CO.

(Circuit Court of Appeals, Third Circuit. May 24, 1917.)

Nos. 2180, 2181.

1. PATENTS ☞328—INFRINGEMENT—PROCESS OF CONCENTRATING ORES.

The Sulman, Picard, and Ballot patent, No. 835,120, for a process of concentrating ores, known as the air flotation process, which consists in mixing the powdered ore with water containing a fraction of 1 per cent. on the ore of oil having an affinity for the ore particles, impregnating the mixture with air, agitating the same until the oil-coated mineral matter forms into a froth composed of air bubbles, and separating the froth from the remainder of the mixture, construed, and claims 1 and 12 *held* infringed.

2. PATENTS ☞232—INFRINGEMENT—PROCESS PATENT.

A defendant, having used the steps of a patented process until, if it stopped there, it would produce the result of the patent, cannot avoid infringement by taking an additional step, even though that step, if taken alone, avoids the patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 365.]

3. PATENTS ☞328—VALIDITY AND INFRINGEMENT—PROCESS OF CONCENTRATING ORES.

The Sulman, Greenway, and Higgins patent, No. 962,678, for a process of concentrating ores, which consists in mixing the powdered ore with water containing in solution a small quantity of a mineral frothing agent, agitating the mixture to form a froth, and separating the froth, the difference between such process and that of patent No. 835,120 being in the employment of a mineral frothing agent, instead of oil, was not anticipated and discloses invention. Claims 1, 2, 5, and 6 also *held* infringed.

4. PATENTS ☞328—VALIDITY AND INFRINGEMENT—PROCESS OF CONCENTRATING ORES.

The Greenway patent, No. 1,099,699, for a process of concentrating ores, which is a modification of that of patent No. 962,678, was not anticipated, and discloses patentable invention; also *held* infringed.

Buffington, Circuit Judge, dissenting.

Appeals from the District Court of the United States for the District of Delaware; Edward G. Bradford, Judge.

Suit in equity by the Minerals Separation, Limited, against the Miami Copper Company. Decree in part for each party, and both appeal. Reversed on complainant's appeal, and affirmed on defendant's appeal.

For opinion below, see (D. C.) 237 Fed. 609.

Henry D. Williams, William Houston Kenyon, and Lindley M. Garrison, all of New York City, Frederick D. McKenney, of Washing-

ton, D. C., and Thomas F. Bayard, of Wilmington, Del., for plaintiff.

Walter A. Scott, of Chicago, Ill., Louis Marshall, of New York City, George Gray, of Wilmington, Del., Thomas F. Sheridan, of Chicago, Ill., and John F. Neary, of Wilmington, Del., for defendant.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. These are appeals from a decree of the District Court in an action brought by Minerals Separation, Limited, a corporation of Great Britain, against the Miami Copper Company, a corporation of Delaware, charging infringement of United States Letters Patent No. 835,120, issued to Sulman, Picard and Ballot, November 6, 1906; No. 962,678, issued to Sulman, Greenway and Higgins, June 28, 1910; and No. 1,099,699, issued to H. Greenway, June 9, 1914, and owned by the plaintiff.

Of the claims in suit the court found claims 1 and 12 of the first patent valid and infringed, and claim 9 invalid; claims 1, 2, 5 and 6 of the second patent valid and infringed; and claims 1 to 12 of the third patent invalid. The decree being in parts adverse to both parties, both appealed, presenting for review the same claims, excepting claim 9 of patent No. 835,120, with respect to which the appeal is abandoned.

As both parties are appellants, we shall speak of them as they stood in the court below.

The three patents in suit, to which we shall refer in the order of their issue as first, second and third, are for processes relating to water concentration of ores. They have for their object, stated generally, the separation of metalliferous matter from gangue or barren matter in ore pulp, by means of oils, fatty acids or other substances which have a preferential affinity for metal over gangue. The first patent, while employing the known selective affinity of oil for metal, is based upon a discovery that that affinity is greatest and metal recovery highest when the proportion of oil to ore is relatively least, and upon the disclosure that that property or characteristic may be brought into action and commercially utilized by agitating the ore-bearing pulp until a foam or froth arises to the surface, carrying with it and holding for recovery the extracted metal.

The process of the second patent is distinguished from the process of the first in that the frothing agent is soluble and develops in solution (when agitated to a froth) a selective affinity for metal similar to that of oil, the insoluble frothing agent of the first patent.

The characteristic of the process of the third patent is that concentration may be effected in the cold and without the aid of acid by the admixture of an aromatic hydroxy compound such as phenol or cresol in the place of the insoluble and soluble frothing agents of the other patents and by agitation of the pulp to a froth.

We are aware that this very brief statement of the distinguishing features of the three patents is technically inadequate and will be understood only by those familiar with the history and development

244 F.—48

of the art of ore concentration. As that art has been extensively considered and elaborately discussed by scientists and courts both in this country and abroad in cases in which the invention in suit was involved,[1] we shall not make even a summary of the art or rehearse the history of this litigation as it has progressed in widely separated parts of the world, but shall rather adopt the whole litigious literature of the invention as matter preliminary to the consideration of the particular issues in this case, repeating only so much as may be necessary to throw light on this new chapter.

### First Patent.

[1] The invention of the first patent in suit is based upon a discovery of an wholly unexplained phenomenon arising from the agitation of ore pulp containing oil and air in certain proportions. This was a discovery in an art in which it was well known that the elements of oil, air and agitation possessed certain characteristics and produced certain results.

Haynes in British patent No. 488 of 1860 first suggested the use of oil in water concentration of ores by pointing out the affinity which oils have for metallic substances in preference to gangue. Carrie J. Everson showed by Letters Patent No. 348,157, that a small quantity of acid in the pulp aids oil in distinguishing between metal and barren material with which it comes in contact. Elmore (Letters Patent No. 676,679), Kirby (Letters Patent No. 809,959), Froment (British Patent No. 12,778 of 1902), Cattermole (Letters Patent No. 763,260), Sulman and Picard (Letters Patent No. 793,808), and others, employed the known affinity of oil for metal in ore concentration processes by using oil in proportions varying from 2 per cent. to 300 per cent. on the ore and recovering the oil-coated metal particles by causing them to rise to the top or sink to the bottom of the pulp.

Agitation of oil-impregnated pulp was old in the art. It was employed by Haynes, Everson, Cattermole, Froment, and Sulman and Picard. In these processes, agitation was either gentle or thorough, but never great, and while always employed to produce a thorough oiling of the metal, it was used in different degrees for the sole purpose of causing the metal particles to rise or sink.

Air and other gases were also known and were developed in the form of bubbles to supplement the natural buoyancy of oil and to assist

---

[1] British Ore Concentration Syndicate, Ltd., v. Minerals Separation, Ltd., 25 R. P. C. 741, High Court of Justice, Chancery Division, affirmed after intermediate reversal in the Court of Appeals by the House of Lords in Minerals Separation, Ltd., v. British Ore Concentration Syndicate, Ltd., 27 R. P. C. 33; Ore Concentration Company, Ltd., v. Sulphide Corporation, Ltd., Supreme Court New South Wales, 31 R. P. C. 216, 217; Ore Concentration Company, Ltd., v. Sulphide Corporation, Ltd., 31 R. P. C. 206, Privy Council British Empire; Minerals Separation, Ltd., v. Hyde, 207 Fed. 956 (D. C. Montana); Hyde v. Minerals Separation, Ltd., 214 Fed. 100, 130 C. C. A. 576 (C. C. A. 9th Circuit); Minerals Separation, Ltd., v. Hyde, 242 U. S. 261, 37 Sup. Ct. 82, 61 L. Ed. 286; Minerals Separation, Ltd., v. Miami Copper Co., 237 Fed. 609 (D. C. Delaware).

the oil-coated particles to the surface. This use of air was disclosed by Froment in 1902 and again by students of the University of California in the California Journal of Technology in 1903, and by Sulman and Picard in the patent referred to (No. 793,808), commonly called the Bubbles Patent.

Thus it may be stated generally that in the prior art, oil was used for its known selective affinity for metal, agitation to mix the oil with the metal, and air to supplement the buoyancy of oil in raising oil-coated metal particles to the surface. To this extent had the art of oil flotation advanced when the patentees entered it, having reached the commercial stage in only two processes, Elmore and Cattermole, representing respectively metal-flotation and metal-sinking processes, and having reached the stage of success in none.

The Elmore process was known as the bulk-oil or oil-buoyancy process. It required from 100 per cent. to 300 per cent. of oil on the ore, that is, from 2,000 to 6,000 pounds of oil to 2,000 pounds of ore, and called for a gentle movement or agitation of pulp in a way that would bring the oil and metal in contact without breaking the oil bulk, and relied for metal recoveries on the buoyancy of the oil (due to the lesser specific gravity of the large volume) to raise and hold on the surface the metal which by affinity it had extracted from the ore. This was an oil-flotation process. It was not successful because the cost of the considerable quantity of oil used and not recovered made its practice commercially prohibitive.

The Cattermole process was just the reverse of Elmore. While this process depended upon the utilization of the same selective affinity of oil for metal, the quantity of oil was relatively small, being from 3 to 6 per cent. on the ore; but the agitation was considerable, having for its object not the retention of the oil in bulk as in Elmore, but its separation and thorough distribution through the pulp, with the object and result of causing the metal particles to be brought together and agglutinated with the metal slimes, forming granules of a size and specific gravity sufficient to cause them to sink, where they were recovered while the gangue was carried off the surface by an up-flow. This was the metal-sinking process. It had a doubtful success in the concentration of copper and zinc ores of high metal content, but like the Elmore process it was impracticable because unprofitable for the concentration of ores of medium and low grades.

It was while the patentees were engaged in developing this process with a mechanical appliance known as a Gabbett Mixer, by which the pulp was agitated, that the discovery of the first patent was made. It was found that when the proportion of oil was reduced below 2 per cent. the agglutination of Cattermole ceased, and metal recoveries ceased also. This so disturbed the theory upon which the patentees were working that they at once embarked on a series of experiments, in which the quantity of oil was progressively reduced from the Cattermole proportion and the agitation varied in intensity and duration. In experiments with oil in proportions just under the Cattermole proportion nothing resulted. The Cattermole concentration was lost and no other concentration was obtained. When in the line of experiments,

the proportion of oil to ore was reduced to 1.5 per cent., a "float" appeared. At 1.04 per cent. "still more float" appeared. At .32 per cent. the "float vastly increased." At .10 per cent., the float again "vastly increased." It thus developed that in using oil at .10 per cent. or even at .05 per cent. on the ore, and after violently agitating the pulp from two and one-half to ten minutes, there arose to the surface when the pulp was brought to rest a thick froth or foam of oil-coated air bubbles carrying oil-coated metal particles to the extent of about 90 per cent. of the metal content, the foam being sufficiently stable to permit removal and metal recoveries.

This was an entirely new result based upon a phenomenon then unknown and still unexplained. It constituted discovery. It was a discovery that promised what has since been accomplished—a change in the art of oil flotation from laboratory experiments and mill failures to commercial success. Its great value especially in zinc and copper ore concentration met with world-wide recognition. The art immediately adopted it and paid tribute to it, either by yielding to the patents covering it or by challenging them in litigation commensurate in scope and importance with the field of the discovery itself. The grounds upon which the validity of the patents was attacked were, first, that the phenomenon was already known, and second, that the patents disclosed no novel means for reducing it to practical use. With the decision of the Supreme Court sustaining the validity of the patent, the two grounds of attack disappeared, leaving open, however, the question whether the discoverers have wholly covered their discovery by a patent, and if not, then how far have they appropriated it to their exclusive use, within the principle that in its naked sense a discovery is not patentable and can be embraced in and controlled by a patent only when and to the extent that its principle is developed into invention by the disclosure of a medium or means which brings it into practical action. Morton v. New York Eye Infirmary, 5 Blatchf. 116, Fed. Cas. No. 9,865.

The particular medium by which and through which the discoverers brought into practical action and put to practical use the principle of their discovery, is a process disclosed in their patent. The process described by the claims in suit, including the elements we have numbered and the distinguishing features we have italicized, is as follows:

"1. The herein-described process of concentrating ores which consist (1) in mixing the powdered ore with water, (2) adding a small proportion of an oily liquid having a preferential affinity for metalliferous matter (amounting to a fraction of one per cent. on the ore), (3) *agitating* the mixture *until* the oil-coated mineral matter *forms* into a froth, and (4) separating the froth from the remainder by flotation.

"12. The process of concentrating powdered ore which consists in separating the minerals from gangue (1) by coating the minerals with oil in water containing a fraction of one per cent. of oil on the ore, (2) *agitating* the mixture *to cause* the oil-coated mineral *to form* a froth, and (3) separating the froth from the remainder of the mixture."

The claims disclose the process. The specification, as usual, throws light upon the process by distinguishing it from the prior art, describ-

ing its operation and result, and referring to illustrations of its prac-
tice in two apparatus, in one of which agitation and consequent aera-
tion and fomentation are accomplished by mechanical means.

The validity of this patent and of its equivalent abroad has been
widely attacked and ultimately sustained. As our task is to interpret
the scope of the United States patent we shall concern ourselves only
with the decisions of the courts of this country.

The first suit on the patent was brought in the District Court of
the United States for the District of Montana. Minerals Separation,
Ltd., v. Hyde, 207 Fed. 956. The validity of the patent was attacked
on the ground of anticipation by the prior art, but the court held the
patent valid and found invention in the novel and useful combination
of oil, air and agitation. Minerals Separation, Ltd., v. Hyde, 207 Fed.
956, 961.

The United States Circuit Court of Appeals for the Ninth Circuit,
reversing on appeal the decree of the District Court, found the patent
invalid, on the ground that its only novelty lay in the reduced quantity
of oil, that this was an improvement only in degree and therefore did
not involve invention. Hyde v. Minerals Separation, Ltd., 214 Fed.
100, 130 C. C. A. 576.

The case was then removed by certiorari to the Supreme Court of
the United States, and while there awaiting hearing, the action at bar
was instituted in the District Court of the United States for the Dis-
trict of Delaware. Minerals Separation, Ltd., v. Miami Copper Co.
(D. C.) 237 Fed. 609.

In this case the District Court held the patent valid and infringed,
finding (in opposition to the Circuit Court of Appeals for the Ninth
Circuit) patentable invention in the use of oil in the minute proportion
of the patent.

Shortly thereafter the Supreme Court heard argument and entered
a decree in Minerals Separation, Ltd., v. Hyde, 242 U. S. 261, 37 Sup.
Ct. 83, 61 L. Ed. 286, by which it reversed the decree of the Circuit
Court of Appeals for the Ninth Circuit and held the patent valid, find-
ing invention, as we read the opinion, in the co-action of the critical
proportion of oil and air effected by "an agitation greater than and
different from that which had been resorted to before," resulting in
a froth concentrate of economical value.

Following the decree of the Supreme Court in Minerals Separation,
Ltd., v. Hyde, this case was argued before us. The decree of the
Supreme Court, with its accompanying opinion in the Hyde Case, ma-
terially changed the aspect of this case on appeal by contracting, and in
a sense expanding, the issues as tried by the District Court. It dis-
posed of the issue of validity, which had been vigorously contested
in the court below. But in disposing of that issue upon grounds dif-
ferent from those upon which the District Court based a like judg-
ment, the question of infringement was acutely enlarged. Upon the
finding by the District Court that patentable invention resides in the
critical proportion of oil, the admitted use of oil in that proportion by
the defendant was manifestly controlling in its finding of infringement,
although the defense extended to the whole of the defendant's prac-
tices. But under the finding by the Supreme Court in the Hyde Case

that invention resides not alone in the critical proportion of oil but also in air and agitation, we are called upon to construe the patent in the light of that finding and determine whether the defendant's practices of aeration and agitation in connection with its admitted use of the critical proportion of oil, are within or beyond the scope of the patent.

It is to be noted and kept in mind that the Supreme Court did not construe the patent or determine its scope, for it had no occasion to do so. In the case before it, infringement was so clear that it had to be found if the patent was valid. The validity of the patent, therefore, was the only seriously controverted issue before the Supreme Court.

In deciding the issue of validity, the Supreme Court disposed of the prior art as anticipations by reviewing by general classification its processes together with the process of the patent, and in so doing used expressions which the parties have severally employed in support of and in opposition to their respective contentions. The plaintiff maintains that the language of the Supreme Court supports its broad contention, that:

"Whenever the modifying agent of the patent (oil) is used, a person infringes who gets air into the pulp in any fashion and agitates the mixture by any means to a sufficient extent to cause the mineral particles to attach themselves to air bubbles and to rise therewith above the top of the mixture in a collection of bubbles and metal particles, to wit, froth."

The defendant maintains that the agitation, in which the Supreme Court found invention, is agitation produced by mechanical means, and that any one, who, though using the modifying agent of the patent in the critical proportion, introduces air into the pulp otherwise than by beating it in, and who agitates the pulp to a metal-bearing froth by any means other than mechanical, or who otherwise obtains the result without any agitation whatever, is beyond the scope of the patent and escapes infringement.

Considered in the light of what the Supreme Court said and what it did not say, it is clear that the positions of both parties are extreme. The contention of the plaintiff at least omits the very definite limitation of the patent to the results obtained by the use of oil within the described proportions, and also the equally definite disclosure of an agitation in violence and duration greater than before employed, while the defendant misinterprets words of description as words of limitation.

The Supreme Court said that:

"The process of the patent in suit, *as described and practiced*, consists in the use of an amount of oil which is 'critical' and minute as compared with the amount used in prior processes * * * and in so impregnating with air the mass of ore and water used by agitation—'*by beating the air into the mass*' as to cause to rise to the surface of the mass, or pulp, a froth, peculiarly coherent and persistent in character. * * *"

By this expression the defendant maintains that the Supreme Court did not merely repeat testimony describing and showing how the process was practiced, but used the words as their own, and thereby interpreted the patent and limited its scope to the introduction of air into the pulp "by beating the air" into the pulp by the specific mechanical means illustratively shown by the drawings of the patent . We

do not so interpret this expression. In the first place the patent nowhere uses the words "by beating the air into the mass." Therefore these words, as quoted by the Supreme Court, were not quoted from the patent, but were taken from the testimony of a witness who used them in describing the process as discovered and developed by the patentees. This being so, we do not think these words, as used by the Supreme Court in describing the process, can be construed as a limitation upon the process.

It further appears that the Supreme Court, in distinguishing the process of the patent from processes of other patents relied on as anticipations, found that the lifting force which separates metallic particles of the pulp from other substances resides chiefly "in the buoyancy of the air bubbles introduced into the mixture *by an agitation greater than and different from that which had been resorted to before.*" By this expression the defendant insists that the court explicitly limited the patent to agitation caused by mechanical means, thereby excluding from its scope such agitation by pneumatic means as was used in part in the defendant's practice. As this expression is susceptible of an entirely different meaning, presently to be considered, we find nothing said by the Supreme Court which indicates that it limited the agitation of the patent to agitation by mechanical means.

The defendant further maintains that the Supreme Court gave to the patent a narrow construction when it used these words:

"While we thus find in favor of the validity of the patent, we cannot agree with the District Court in regarding it valid as to all of the claims in suit. As we have pointed out in this opinion, there were many investigators at work in this field to which the process" of the patent "in suit relates when the patentees came into it, and it was while engaged in study of prior kindred processes that their discovery was made. While the evidence in the case makes it clear that they discovered the final step which converted experiment into solution, 'turned failure into success' (The Barbed Wire Patent, 143 U. S. 275 [12 Sup. Ct. 443, 36 L. Ed. 154]), yet the investigations preceding were so informing that this final step was not a long one, and the patent must be confined to the results obtained by the use of oil within the proportions often described in the testimony and in the claims of the patent as 'critical proportions' amounting to a fraction of 1 per cent. on the ore. * * *"

We are inclined to the opinion that by this expression the court intended a limitation only upon that one feature of the patent to which the expression was addressed. The District Court had held valid certain claims in which the proportion of oil was described simply as "a small quantity," and the Supreme Court in reversing that finding and holding those claims invalid, used the quoted words of limitation in confining the patent to the results obtained by the use of oil in the critical proportions of less than 1 per cent.

From this recital of the litigation of the invention of the first patent it appears that in construing the claims of the patent we are greatly aided by the opinion of the Supreme Court in being told with authoritative finality that the process involves invention and in being shown in which of its elements invention resides; but it is equally clear that in determining the breadth and scope of the claims, we are without the aid of any adjudication in which their scope has been decided or even considered.

The elements of the patent in which invention is found are oil, air and agitation. These were old in the art, possessing as we have shown, known characteristics and functions, and had they performed in the process of the patent no new or different function or had they produced no new or different result, it is clear they would have anticipated the patent and defeated its claim to invention. But a finding by the Supreme Court that the invention was not anticipated by the old uses and results of these elements is in effect a finding that these elements as used in the process of the patent perform or develop new uses and functions or produce different results. And such we find to be the fact.

The invention, as we have said, is founded upon a discovery. Its patentability depends upon the medium disclosed in the patent by which the force or principle of the discovery is brought into action. Three new uses of old elements are disclosed by the patent, producing a new result. The first relates to oil.

The affinity of oil for metal was known, and though old, was employed in the invention; but that this affinity in a given condition is greatest when its quantity is relatively least or that the affinity increases with the decrease of oil below a given quantity (less than 1 per cent.) is the soul of the discovery and was wholly new. But the discovery did not consist of this alone. The newly discovered phenomenon of the minute quantity of oil is not a chemical phenomenon. Oil in pulp in minute quantity if inert and left alone will do nothing and produce nothing. Something must be done to develop it. The phenomenon not being susceptible of development by chemical change, is developed by physical change of the pulp. As a medium or means of producing that change and creating the condition under which the phenomenon arises, the patentees pointed out—agitation.

The agitation of the patent does several things, old and new. It mixes the oil with the metal of the ore. This is old. Then by its greater intensity and longer duration it stirs the pulp into a froth, developing at once its own new use as a frothing means and still another new function of oil—that of a frothing agent. Both are new.

But froth is made of air as well as oil. Air in bubbles is used for its old function of assisting or escorting metal particles to the surface. But it is also used for the entirely novel purpose of supplying one of the essential elements of froth, froth being the new result intended.

Thus oil is used for its newly discovered characteristics of greater metal affinity when in minute quantity and for its new function as a frothing agent; air for the new purpose of supplying an element of froth; and agitation for its new purpose of bringing the two together and causing them to co-act and produce the new result of a metal-carrying froth. In other words, in so employing these old elements for new purposes, the new things which the patentees told the art are that a radical decrease of oil in conjunction with a radical increase of agitation, develops to its highest potentiality the known affinity of oil for metal and produces a physical change in the pulp in the form of a froth by which metal recoveries are made possible and commercially profitable. The importance of these disclosures, scientifically and commercially, is manifest.

In approaching a consideration of the scope of the patent, we lay aside those features of the discussion in which the plaintiff demands by broad construction the highest reward for a great contribution to a feeble art, and in which the defendant, contending for a narrow construction, emphasizes the servitude of a great art to a patent monopoly. The rights of an inventor and of an art in an invention are established by law and are not affected by other considerations. Speaking generally, the statutes give an inventor a patent monopoly of his invention to the extent of his patent disclosures, and to that extent the art is servient to his monopoly. Everything touching the invention not disclosed by the patent is free to the art without regard to the value of the inventor's contribution. So the question of law in this case, involving as it does large interests and perhaps far-reaching commercial results, is no different from similar questions constantly appearing in controversies of smaller compass. The question simply is whether certain practices come within the scope of the patent claims. But the question of infringement has grown far beyond the borders of the case and we are really asked both by the plaintiff and defendant to determine the scope of the patent in such terms as will inform the art as well as the owners of the patent the precise field covered by the patent and the extent of the field left free to the art. Such a decision to be useful must of course be predicated upon facts that make it legally possible, for otherwise we encounter the futility and the mischief of construing a patent in general terms and without reference to the occasion or thing which calls for its interpretation. To avoid this error we shall confine ourselves to the precise issues of this case as developed by the evidence, and without regard to other considerations we shall construe the patent with reference to the particular practices which are represented by one party to be within its scope and by the other to be beyond it.

The defendant practiced four processes of ore concentration, using in all the fomenting agent of oil in the critical proportion of the patent. Two processes were practiced before suit was instituted, the third during the progress of the trial, and the fourth after the record had been completed and the trial closed. As the infringement found by the decree relates to the processes appearing in the record, only those processes are before us on appeal.

*First Process.*

The defendant company owns and operates a large porphyry copper mine at Miami, Arizona. The ore is low grade and of a kind peculiarly responsive in concentration to the process of the patent.

The defendant employed a metallurgical mining engineer to develop and install in its reduction works an oil-flotation concentration plant. The engineer made repeated visits to the mill of a neighboring copper company, a licensee of the plaintiff, studied the process of the patent there in practice, and reproduced it in the mill of the defendant. This was a small plant, of a capacity of but two tons per hour or forty-eight tons per day, operated during the period from December, 1913, to August 5, 1914. It was used evidently more as a testing or experimental

plant for another process then being developed than for commercial purposes.

This constituted the defendant's first process, and as infringement was not disputed, we affirm without discussion that part of the decree holding infringement by this process.

*Second Process.*

On August 7, 1914, two days after the discontinuance of the first process, the defendant started its second process in a plant which it had constructed during the practice of the first. This plant may best be understood by a diagram furnished by the defendant and by its own detailed description of its operation appearing in its brief:

DIAGRAM OF THE MIAMI EXPERIMENTAL FLOTATION PLANT

"The material treated in the flotation plant at Miami is received through the launder or trough *A*, the same bearing the legend 'Original Pulp Feed.' This material is a freely flowing pulp, and flows into the box or tank *B*, upon which the following inscription appears, 'Sump from Which Pulp is Pumped.' The oil or other modifying agent is supplied to the pulp through the pipe *L*, marked 'oil feed.' A centrifugal pump *C* raises the pulp from the sump *B*, and forces it upwards through a pipe *D*, from which the pulp passes into an inlet funnel *E*. The pulp flows from the funnel *E* downward through a pipe *F* and enters the Pachuca tank *G* through the side thereof, as shown in the drawing. A small air pipe *H* extends downwardly from the top of the Pachuca to a point near the bottom thereof, where it delivers an air jet at the point designated *I*. The small air pipe *H* is surrounded by a larger pipe *J*, open at both ends. There is an annular space between the pipes *H* and *J*, and the air entering the lower end of the large pipe *J*, through the pipe *H*, permeates the pulp contained in the pipe *J* with small bubbles, which have the effect of forming a mixture of air and pulp of lower specific gravity than the

pulp alone. The lightened column of air and pulp in pipe *J* rises and is projected against a conical deflector *K*, and then falls into the main body of the Pachuca. The circulatory movement of the pulp in the Pachuca tank has the effect of thoroughly mixing the oil with the pulp. The pulp flows from the top of the Pachuca tank into a box *M*, whence it is conducted by the launder or trough *N* to the air cells, marked *1*, *2*, *3* and *4*.

"The air cells *1*, *2*, *3* and *4* are similar in construction. The bottom of each cell consists of four plies of canvas, beneath which are eight air compartments, separate and distinct from each other, extending in a series from end to end. The canvas bottom of the machine is inclined, thus making the cell deeper at one end than at the other, and it is for the purpose of getting an even distribution of air that the eight compartments are used, it being obvious that if there were a single air compartment most of the air would escape at the shallow end, where the water pressure is least. Air under slight pressure is supplied to the compartments beneath the cells *1*, *2*, *3*, *4* and *5*, by means of a blower designated by the letter *M* upon the drawing. The air is conducted through a pipe marked 'Air Main' from the blower, and branch air pipes, shown most plainly at the right of cell No. 1, conduct the air to the several compartments beneath the cells. The degree of air pressure necessary is quite slight, and, as stated by Mr. Yerxa, it is necessary to use merely enough pressure to overcome the hydrostatic head of the pulp and to force the air through the permeable medium, that is, the canvas bottom.

"The air so pumped beneath the canvas bottoms of the cells *1*, *2*, *3*, *4* and *5* passes upward through the pores of the canvas into the pulp, and the bubbles rise through the pulp in a manner similar to the rising of the bubbles through a glass of carbonated water."

For the purpose of this discussion, the details of the apparatus and of its operation, may be simplified by referring to its four essential parts: *C*, centrifugal pump; *E*, a break or open space between the pipe of the pump and the Pachuca tank which does not appear on the diagram or in the defendant's account of the operation; *G*, Pachuca tank and its appliances; and *1*, *2*, *3*, *4* and *5*, Callow cells.

Before following the steps or rather the flow of the defendant's process, we should have in mind the theory of its practice. The defendant maintains that the process of the patent is "an *agitation* froth process," that is, a process by which the desired metal-bearing froth is obtained by agitating pulp containing the critical quantity of the frothing agent (oil) "to cause" the froth to arise or "until" a froth is formed. It says that its process, in contradistinction to the process of the patent, is a *"bubbles* process" (containing the same critical quantity of the same frothing agent), by which air, introduced into the pulp from below, passes through the pulp "without any agitation whatever," and arises to the surface in short-lived evanescent metal-bearing bubbles forming a *"foam."* It maintains that by introducing air into the pulp by sub-aeration it produces a foam or froth otherwise than by agitation, that nowhere in the process is there agitation, or that, at most, there is only such agitation as appears in the prior art.

Agitation "to cause" a froth or agitation "until" a froth is formed, being the disclosed means of the patent to produce the phenomenon of the critical quantity of oil, and aeration without agitation being the defendant's claimed means of causing or obtaining the same phenomenon from the same critical proportion of oil in the form of an evanescent foam, the controversy revolves around the elements of aeration and agitation.

*C.* Centrifugal pump. The first step in the defendant's process was a centrifugal pump. The defendant claims its one function was that of lifting the pulp (containing oil in the critical proportion of the patent) from one floor of the mill to another, and that in doing so the pulp was neither agitated nor aerated. Opposed to this contention and to the testimony supporting it was testimony that a centrifugal pump drawing air and liquid was the most common type of agitator and aerator of the cyanide art before the Pachuca tank was invented; that in the defendant's apparatus, air was drawn with the liquid into the pump in large quantities; and that in revolving at the rate of 850 revolutions per minute the pulp was violently agitated and measurably aerated.

Reconciling the conflicting testimony as best we may, we are forced to the conclusion that the pump revolving at the rate of 14 revolutions per second could not well avoid agitating the liquid it hoisted; that the agitation was violent; that air was drawn in with the liquid and that to an extent the pulp was aerated within the sense of the agitation of the patent and also by the very mechanical means or its equivalent to which the defendant insists the patent is limited.

*E.* Break in the circuit. At the point *E* in the pipe between the pump and the Pachuca tank there was a break not appearing in the diagram, permitting the pulp, arising from the pump in its agitated and partially areated state, to drop for a space through the air into a larger pipe, whence it was carried to the Pachuca tank. While this was not a prominent feature of the defendant's process it was of sufficient consequence for the defendant to use it. It had the effect of producing further agitation of the pulp in its fall and further aeration arising from that agitation. It was known as splash agitation, its principle appearing in the early attempts to purify water by aeration. We are satisfied that this constituted agitation and aeration by agitation, and again by mechanical means to which it is sought to limit the patent.

*G.* Pachuca tank. The pulp twice agitated and aerated was then carried without stopping into a Pachuca tank. This appliance, briefly described, is a tank 18 feet 6 inches high by 4 feet in diameter. Descending in its center are two pipes or columns, one within the other, and in operation compressed air is released through the inner one, sending the fluid in an upward current through the outer one until it strikes with force an overhanging cone or umbrella, which causes it to splash and fall back into the tank, to be subjected again and again to the same revolving movement for a period of time measured by minutes.

The Pachuca tank was taken from the cyanide art, where its one function was agitation and aeration, or rather aeration by agitation. Although agitation is denied by the defendant to be a part of its process, it cannot be seriously contended in the face of the testimony and of the demonstration of the action of the Pachuca tank before us, that the force of compressed air to which the pulp in the tank is subjected, does not cause agitation and very violent agitation.

But the defendant contends that the agitation of the patent is lim-

ited to agitation occasioned by mechanical means, and as the agitation in the Pachuca tank is caused by pneumatic means, it is beyond the scope of the patent. This contention is based not alone upon the words of the Supreme Court which we have already discussed, but upon the relation of a mechanical device to the discovery of the invention.

It appears that in the experiments in which the discovery was made, the inventors agitated various mixtures by an apparatus known as a Gabbett Mixer, and when they came to reduce their discovery to invention and patent it they illustrated diagrammatically "one form of apparatus suitable for carrying this invention into practice," which included such a mixer. The patentees did not attempt to patent a mechanical means by which their process could be practiced. This is obvious, for the means illustratively shown was a mechanism already patented (No. 444,345, Gabbett Mixer 1891). Nor did they attempt or intend to limit their patent to any mechanical means. Their patent was for a process. But without regard to their intention, did they in fact so limit it? That depends upon what they disclosed by their patent.

By their disclosures they first told the art that a maximum metal recovery could be had from a minimum oil content. Up to the time of this disclosure that was an unknown phenomenon. But this disclosure alone, interesting as it was, would have been valueless to the art, and would not have entitled the discoverers to a patent, until they told how and by what medium that phenomenon could be brought into practical use. Knowing this, they then told the art by the same disclosures that the minute quantity of oil, besides possessing an affinity for metal, was a frothing agent, and when used as such the phenomenon appeared in the froth it developed. But the patentees did not stop with the disclosure that fomentation is the condition out of which the phenomenon arises, but proceeded by further disclosures to tell the art that the way to produce the desired fomentation is by agitating the pulp containing the frothing agent. But agitation of certain kinds for certain purposes was well known, so they went further and told what was not known, namely, that the agitation requisite to fomentation of the character desired, is agitation "greater than and different from that which had been resorted to before," that is, greater than the more or less brisk or vigorous test-tube agitation of early patents and of the Cattermole process, and different from the revolving gentle agitation of the Elmore bulk-oil process, and that it must be violent in character and extended in duration in order that air (the other element of fomentation) might be brought into the fluid and into co-action with the minute quantity of the frothing agent. They thus disclosed not only agitation but the kind of agitation as the medium or means by which the principle of their discovery could be reduced to practice. Agitation was thus made the practical element of their patented process, and by their patent disclosures they told the art that agitation was the secret by which the principle of their discovery could be unlocked and used.

If the same principle can be turned to use and the same results obtained without agitation, or by an agitation which is not the equivalent

of the agitation of the patent disclosures, we may have another question; but when the critical quantity of oil is used and fomentation is produced by agitation, which in degree of violence and in duration is substantially that of the patent, clearly it is indifferent whether it is attained by mechanical or other means, for the patent deals with agitation as a means of developing the discovery, not with means for developing agitation.

Accepting the teaching of the patent with reference to agitation as a means, the defendant employed it, certainly in three, if not in four, of the steps of its process. In the first and second, agitation was obtained by mechanical means; in the third (the Pachuca tank), by pneumatic means. It is upon this difference in means to produce agitation that the defendant, in part, defends the charge of infringement. But what it sought and what it got by the use of the Pachuca tank was agitation, and that is what the patent told it to get, and we conceive it makes no difference whether it got it by mechanical or pneumatic means. We see no difference between the blow of a paddle and the blow of a blast of air as means to produce agitation. And the defendant itself shows there is no difference between the two in procuring the agitation of the the patent, for by agitating the pulp in the Pachuca tank by pneumatic means with an intensity and for a period of time sufficient to aerate the pulp, the defendant got the precise metal-bearing froth of the patent. This was unintentionally and accidentally shown on one occasion when the Pachuca tank was cut out of the process and the pulp brought to rest. The characteristic froth of the patent arose at once and formed in a collar two feet thick. In view of the agitation to which the pulp had been subjected, we must assume that it was the result of that agitation.

Thus far the defendant did everything that is disclosed by the process of the patent. It used the critical quantity of oil. This is admitted. It agitated the pulp by one means and another with an intensity and for a time sufficient to change the physical character of the pulp, as intended by the patent, and developed in it the quality of producing an air-bearing froth, which it did when permitted to come to rest. But in the practice of the defendant, agitation was not stopped or even arrested in the Pachuca tank. The pulp was carried in circuit without stopping and without abatement of agitation into Callow cells, carrying with it the air content accumulated by the agitation of the centrifugal pump, the air drop and the Pachuca tank.

*1, 2, 3, 4, 5. Callow cells.* As a last step, the pulp was conveyed into Callow cells. A Callow cell is a rectangular tank with a sloping bottom made of canvas, through the perforations of which compressed air ascends in myriads of air bubbles through the liquid it contains. By this process, the defendant contends it pursued a practice taken from the prior art and entirely outside the scope of the patent.

In this connection much stress has been placed by the defendant upon the prior art, on the theory that as the Supreme Court found the invention not anticipated, all that the prior art contains is open to it without the hazard of infringement. This position is unobjectionable.

It is clear that if the defendant practiced the process of the patent and obtained a different result, or if it practiced a different process and obtained the same result, it did not infringe. To do this it was free to resort to a practice of the prior art or to a practice new to the art. It chose to rely upon a practice of the prior art, which, though producing the same result in metal recoveries as that of the patent, it maintains differed from it in its steps and means. It was based upon Patent No. 793,808 granted to Sulman and Picard (two of the patentees of the patent in suit), and commonly called the Bubbles Patent. This patent, though it never reached the mill, has been extensively discussed by experts and counsel. Air is introduced into the bottom of a tank similar in shape to that of a Callow cell. Near the bottom is a perforated helical worm or tube, through which, while revolving, air is permitted to escape and ascend in bubbles to the surface. As the pulp is modified by oil (not the critical quantity of the patent) the air bubbles and metal particles are coated with oil, whereupon the oil performs its known affinity for metal and air its known characteristic to ascend and assist the oiled metal to the surface.

While there is a similarity in principle between the mere introduction of air in the Callow cell and in the Bubbles tank, the purpose for which air is injected and the function which air performs after it is injected are altogether different in the two. Before the pulp is put into the Bubbles tank it is agitated for the purpose of mixing the oil and coating the metal particles, and when that is done it is turned into the Bubbles tank where the air bubbles, liberated through the perforations of the coil, attach themselves to and escort the oil-coated metal particles to the surface, where they are carried off by skin flotation. In the Callow cell of the defendant's process (the claimed equivalent of the Bubbles tank) air was used for another purpose. The pulp first agitated to the potentiality of the critical quantity of oil and air of the patent was carried into the Callow cell, and with its elements thus fully developed was subjected to an air blast, which did two things, resulting in a third. First, the air blast further aerated or super-aerated an already fully aerated pulp by driving into it myriads of air bubbles, and second, caused an agitation which while considerable was not violent, resulting in a foam, which persisted so long as air pressure was maintained, and which had a metal-bearing quality and sufficient stability to permit recovery by overflow.

A peculiar feature of this step in the process and upon which the defendant earnestly relies to distinguish it from that of the patent, is, that if the pulp agitation of the Callow cell is arrested by withdrawing the air pressure, the foam immediately subsides and the froth of the patent does not arise as it did when agitation was arrested in the Pachuca tank. This is true. It is equally true that in this fourth step, aeration is direct and is not the result of or caused by agitation. On the contrary, agitation results from aeration, and such agitation, though present in some measure, is not even approximately of the violence and duration of the agitation of the patent. The operation in the Callow cell certainly possesses these distinguishing features

from operation of the process where aeration is caused by agitation. Emphasizing this difference in its favor, the defendant pressed further and urged that the operation of the Callow cell was not dependent upon the precedent treatment of pulp in the Pachuca tank, and that the same results could be obtained from the Callow cell without such previous agitation and aeration. This assertion is based upon an experiment made by the defendant in the presence of representatives of the plaintiff when the Pachuca tank was cut out of the system and pulp from the centrifugal pump was shunted directly into the Callow cells, with the result that the Callow cells continued to perform their function of supplying air bubbles, agitating the pulp to a degree and forming an overflowing metal-carrying foam. But the metal carried over was not assayed and we do not know what were the commercial results of the test. We know, however, that this was but an experiment and after the experiment had been concluded, the defendant returned immediately to its practice of using the Pachuca tank. Nor are we informed as to what would happen if the centrifugal pump had also been cut out, because whether in the mill or in the laboratory, so far as we have been shown, it appears that *before* the Callow cell (or Bubbles tank) is called upon to perform its task, the pulp is always pre-agitated and pre-aerated in some fashion and to some extent. Even in the demonstrations of the Callow cell and the Bubbles tank made before us in court, the defendant's demonstrator caused the pulp to be violently agitated by a *Gabbett Mixer,* the illustrated means of the patent, for a period of time measured by a stop-watch before it was turned into the cell and tank.

[2] Notwithstanding the defendant's testimony is silent as to what a Callow cell would do to pulp that had not been previously agitated and aerated, and notwithstanding all Callow cell demonstrations before us were made with pre-agitated and pre-aerated pulp, the case for the defendant was largely argued as though its process consisted solely in passing thoroughly mixed but quiescent pulp directly into Callow cells, where it received its first and final aeration without previous or present agitation, resulting in a metal-bearing foam with characteristics different from those of the froth of the patent. We find nothing in the evidence or in the demonstrations which justifies that argument. If the only agitation to which the pulp was subjected (after such agitation as in the prior art was necessary to mix the oil and ore) was the agitation of the Callow cells, we would not say that that agitation amounted to or was the equivalent of the violent agitation of the patent disclosure and constituted infringement; but in the process we are considering and upon which the decree we are reviewing was based, the Callow cells were not the whole process but were merely the last of four distinct parts of the process, the other three being the process of the patent or its fair equivalent. Having used the process of the patent in the first three steps in developing in the pulp the potentiality of the critical quantity of oil and air and in bringing the pulp to the point where, if permitted, it would produce the result of the patent, we feel that the defendant cannot escape infringement by taking an additional step, even though that step if taken alone avoids the patent.

*Third Process.*

The third process of the defendant was developed and put into practice during the trial and constituted one of the defenses to the charge of infringement. There is little difference between it and the second process. It is shown by the accompanying reproduction of a blueprint of the apparatus in which it was practiced:

BLUE PRINT OF NEW MIAMI MILL.

The plant is shown to comprise two independent sets of flotation cells, one at the right and the other at the left of the drawing. The flotation cells are designated: "4. Roughing Cells" and "2. Cleaner Cells." Adjoining each group of cells is a Pachuca tank. The operation begins upon the 22 concentrating tables, so numbered upon the drawing. The material rejected by these tables is treated by the flotation process. The flow of pulp in the tables through the launders takes place by gravity until the pulp reaches a bucket elevator, which is the substitute for the centrifugal pump in the second process. When the pulp is raised by the elevator to an upper floor it is divided and flows in equal parts into two Pachuca tanks, thence to the Callow cells, where metal recoveries are obtained by froth overflow.

The value of this process, as a defense, is found in an experiment to which it was subjected. The plant was arranged in two groups of identical members. In the experiment, one group was operated with the Pachuca tank as planned. In the other, the Pachuca tank was cut out and the pulp conveyed directly from the elevator to the cells. The result was no apparent difference in the action of the pulp and little difference in the assays of the metal recoveries, that difference, curiously enough, being in favor of the group in which the Pachuca tank was not used. The evidence of the fact and of the effect of this experiment was not contradicted, except, perhaps, by the defendant itself, by returning at once to its previous practice of using both Pachuca tanks, and in pursuing that practice to a time beyond the trial. This fact places the third process in the position of the second, where we have found that agitation and aeration of the Pachuca tank is the agitation of the patent, and amounts to infringement.

*Fourth Process.*

The fourth process is not in the record and was not considered by the District Court in reaching the decree now before us on appeal. It was brought to our attention during the argument by counsel, who said that in the process developed by the defendant after the trial, and now practiced, the Pachuca tanks are eliminated, the pulp being delivered directly from the bucket elevators to the Callow cells. While we are loath to omit from our consideration and judgment anything affecting this very important patent and the art to which it relates, we feel, nevertheless, that we cannot consider and adjudge with propriety or authority a process with respect to which the plaintiff has had no opportunity to produce testimony and which was not embraced in the decree we are reviewing.

We find no error in the decree of the District Court holding valid and infringed claims 1 and 12 of the first patent in suit.

## Second Patent.

[3] The second patent involved in this suit, No. 962,678,—also for improvements in ore concentration,—was applied for on April 30, 1909, was issued on June 28, 1910, to Sulman, Greenway and Higgins, and has not been judicially passed upon except by the court below.

Its particular object is "to separate certain constituents of an ore such as metallic sulfids from other constituents such as gangue when the ore is suspended in a liquid such as water."

It is also an air-froth flotation process but differs from the first patent, although both processes may be, and both actually are, employed conjointly. Its essential feature is the use of a mineral-frothing agent in solution, and the method will be best understood by turning to the specification:

"According to this invention the crushed ore is mixed with water containing in solution a small percentage of a mineral-frothing agent (that is of one or more organic substances which enable metallic sulfids to float under conditions hereafter specified) and containing also a small percentage of a suitable acid such as sulfuric acid, and the mixture is thoroughly agitated; a gas is liberated in, generated in, or effectively introduced into the mixture and the ore particles come in contact with the gas and the result is that metallic sulfid particles float to the surface in the form of a froth or scum, and can thereafter be separated by any well known means. Among the organic substances which in solution we have found suitable for use as mineral-frothing agents with certain ores are amyl acetate and other esters; phenol and its homologues; benzoic, valerianic and lactic acids; acetones and other ketones such as camphor. In some cases a mixture of two such mineral-frothing agents gives a better result than a single agent. The above mentioned mineral-frothing agents are all more or less effective in the presence of an acid such as sulfuric acid and are given as types but are not intended to form an exhaustive list of suitable organic substances which may be used in this manner and for these objects. On the other hand there are many organic compounds which in solution will not effect the result described, such as some sugars, dextrin, saponin, albumen, ox gall, etc., and a simple test is required in the case of varying ores or materials to determine which organic compound is most suitable.

"The following is an example of one method of carrying this invention into effect: Water containing a small percentage of sulfuric acid in solution, say from .2 per cent. to 0.5 per cent., and containing in solution a small quantity say 0.1 per cent. of one of the foregoing organic substances (say amyl acetate) is, with finely pulverized ore, introduced into an agitating apparatus, in the proportion of say 3 parts by weight of water to 1 part by weight of ore. The agitation is carried out in such a way as thoroughly to disseminate air through the mixture which is thereafter discharged into a spitzkasten. It is found that a coherent froth or scum floats on the surface of the water in the spitzkasten. This froth contains a large proportion of the metallic sulfids but is substantially free from gangue. Any well known means may be employed for collecting the froth. If desired the tailings can be re-treated by the same process with or without the addition of fresh quantities of the organic materials referred to. The action may in some instances be improved by heating the mixture. * * *

"Several agitation vessels are placed in series. These may conveniently be large vats separated by partitions having openings at the bottom so that the liquid may pass from one to another. Each vessel is provided with a rotatable stirrer which is conveniently of the form shown in the drawing. Each stirrer is carried on a spindle rotated at a high speed by any convenient means. Crushed ore or similar finely divided mineral is fed into the first vessel through any convenient ore-feeding device, * * * and water is also fed into the vessel. A small proportion of acid, such as sulfuric acid, may be introduced into the water from the feeding vessel, and a small proportion of one or more other soluble substances which enable metallic sulfids to be floated by air under the conditions hereafter specified, may be introduced from the feeding vessel. The liquid containing ore in suspension is vigorously agitated in the agitation-vessels and escapes at the outlet highly charged with air.

"A settling apparatus consisting of one or more spitzkasten is placed immediately at the outlet from the agitation apparatus. As shown in the drawing, the spitzkasten has a launder to receive the floating froth which passes away through the outlet. The liquid and the sunken material pass out through the outlet at the bottom of the spitzkasten. The level of the liquid in the spitzkasten is slightly above the lip. Within the spitzkasten is placed an inclined baffle or guide-plate, which may be made adjustable, extending upward from below the inlet and arranged to direct the stream of ore-particles and air-bubbles toward the surface of the liquid in the spitzkasten.

"Hitherto many proposals have been made for the wet concentration of ores involving the addition to the liquid in which the ore is suspended of an immiscible liquid. For example in the patent granted to Cattermole, Sulman & Picard, United States No. 777,274, dated December 13, 1904, is described a process of ore concentration in which metalliferous particles were coated with a thin film of a fatty or resin acid or a phenol or a cresol by introducing the alkaline compounds of these materials into an acid liquid whereby these materials were liberated in an immiscible or insoluble condition and adhered to the mineral particles. In another known process the powdered ore suspended in water, preferably acidified, is mechanically brought to the surface whereby the particles are exposed to the air and it is found that the metalliferous particles float on the surface while the gangue sinks. In this known process the selective flotation of the metalliferous particles is not due to the metalliferous particles being coated with a selective agent, that is to say, the selective flotation is due to the properties of the metalliferous particles themselves when exposed to air or other gas and brought onto the edge or surface of water preferably acidified.

"The present process differs from the two before mentioned types and from other known concentration processes by the introduction into the acidified ore pulp of a small quantity of a mineral-frothing agent; i. e., an organic compound in solution of the kind above referred to and by the fact that the metalliferous particles are brought to the surface in the form of a froth or scum not by mechanical means but by the attachment of air or other gas bubbles thereto.

"In the frothing processes hitherto known the substances used to secure the formation of a mineral-bearing froth has been oil or an oily liquid immiscible with water. According to this invention the mineral-frothing agent consists of an organic compound contained in solution in the acidified water.

"We do not confine ourselves to the proportions above given, the best proportion can in each case be easily determined by trial.

"It is well known that certain of the organic substances we have referred to are not soluble in water in all proportions and that if used in excess might partly remain insoluble in the acidified water and might become mechanically affixed to the metalliferous particles of the ore. We disclaim any such use of these substances and only claim them in such amount as will enable them to dissolve in the acidified water."

The claims in issue are the following:

"1. The herein described process of concentrating ores which consists in mixing the powdered ore with water containing in solution a small quantity of a mineral-frothing agent, agitating the mixture to form a froth and separating the froth.

"2. The herein described process of concentrating ores which consists in mixing the powdered ore with water containing in solution a small quantity of an organic mineral-frothing agent, agitating the mixture to form a froth and separating the froth."

"5. The herein described process of concentrating ores which consists in mixing the powdered ore with water containing in solution a small quantity of a mineral-frothing agent, agitating the mixture and beating air into it in a finely divided state so as to form froth and separating the froth.

"6. The herein described process of concentrating ores which consists in mixing the powdered ore with water containing in solution a small quantity of an organic mineral-frothing agent, agitating the mixture and beating air into it in a finely divided state so as to form a froth and separating the froth."

The difference between the two patents may be shortly stated to be this: The first process rests upon the use in very small quantity of an oily substance that does not dissolve in water, coupled with agitation of the pulp, and this succeeds in producing a special froth that is remarkably effective in recovering the minute particles of ore. The second process does not employ oil, or an undissolvable substance; on the contrary, the "mineral-frothing agent" must be in solution, and ex vi termini must therefore be dissolvable. The specification disclaims the use of so large a quantity that part of it remains undissolved. The "mineral-frothing agent" is further limited by describing it as "one or more organic substances which enable metallic sulfids to float under conditions hereinafter specified"; and, as this general statement does not convey specific information, the patentees give several examples of organic substances that are found to be suitable for use in solution. In passing we may note that claims 1 and 5 are broad enough to cover inorganic frothing agents also, but as no such agent is yet known this feature need not now be considered. Just how or why this solution with the needful agitation produces the froth, is not certainly known; but the fact is, that (to use the language of the brief):

" * * * Its effect [is] to produce a similar action of air bubbles in the attraction of metallic particles, a similar levitation of the metallic particles, a similar persistence of the bubbles, a similar reliable adherence of the air bubbles to the metallic particles, and a similar capacity for final separation of the metallic particles by their overflow, still in attachment to air bubbles, at the top of a vessel containing the pulp."

An observable difference in effect is that the froth of the second patent is composed of bubbles much smaller than the bubbles of the oil process.

We may also note that while the addition of an acid to the mineral-frothing agent is described as part of the process, this was at that time a usual practice, and in any event is not an element in the claims now in issue. The agitation is to be thorough, but in the same connection the means for bringing this about is described in terms that are wide and inclusive. The air or other gas is to be "liberated in, generated in, or effectively introduced into, the mixture," in order that the ore particles may come into contact with the gas and as a result may float to the surface in the form of a froth or scum which can be separated afterward by any well known means. The object of introducing the air or other gas into the mixture is such agitation of the pulp as will produce the desired froth, but the claims are not confined to a particular device or a particular degree of agitation. But of course, the agitation must be thorough and it must be effective, these being matters for experiment but always with the ultimate object of bringing the sulphid particles to the surface and holding them there in the grasp of a froth.

We do not find it necessary to discuss the question of validity; our

conclusion is, that the patent discloses invention and has not been anticipated. As in the case of the oil process, the patentees seem to have taken "the final step which converted experiment into solution, turned failure into success." Minerals Separation Co. v. Hyde, 242 U. S. 261, 37 Sup. Ct. 82; 61 L. Ed. 286. And we find nothing in the prior art that can be held to anticipate. The real question upon this patent also is the question of infringement, and here as well as there the decision turns upon the kind and degree of agitation employed by the defendant. We need not dwell upon the subject, for as the defendant used both processes conjointly it is evident that what has been said about the infringing agitation in the oil process must also apply to the same agitation when considered in reference to the second process. There is this difference, however; as pointed out above, the agitation of the second process is so described as to cover expressly a wider range of means and degree than is expressly covered by the first process, and therefore needs less aid, if any, from the doctrine of equivalents. For the reasons given in discussing the oil patent, we think the defendant's practices there described infringe also the process now under consideration.

### Third Patent.

[4] The third patent involved in this suit, No. 1,099,699,—also for improvements in ore concentration,—was applied for on June 30, 1911, was issued on June 9, 1914, to Henry Howard Greenway, and has not been judicially passed upon except by the court below. As stated in the specification, its process is "a modification of the invention described in U. S. Patent to H. L. Sulman, A. H. Higgins and myself, No. 962,678, granted June 28, 1910," which is the second patent here in suit. Greenway's particular object was "to separate certain constituents of the ore such as copper sulfides (for example in the form of copper pyrites or metallic copper natural or reduced) from other constituents, such as gangue where the ore is suspended in a liquid such as water." After describing the process of No. 962,678, as one "applicable generally to the recovery of metallic sulfides and like floatable metalliferous matter and in case of lead and zinc sulfides to which the process has been largely applied" and stating that in such process "it is necessary for efficient working that the pulp should be lightly acidified, and in most cases in practice the pulp is heated," the patentee disclosed his discovery, namely, that both acids and heat can be dispensed with, saying that "it is now found that with copper ore such as an ore containing copper pyrites effective separation is obtained in the cold without the use of acid by employing as mineral frothing agents, aromatic hydroxy compounds such as phenol, cresol, or mixtures containing the same." Upon this disclosure the claims here in issue were granted, illustrative of which claim 12 is for "a process of concentrating ores which consists in mixing a powdered ore containing copper with neutral water containing in solution a minute quantity of cresol, agitating the mixture in the cold to form a froth and separating the froth." In the court below the patent was held invalid and agreeing as we do with

the conclusion reached by it in reference to the first and second patents, we are the more inclined to follow its decree in reference to the third patent. But an examination of the proofs satisfies us that the process disclosed in this patent was a substantial departure from processes of the prior art. The heating of water is a matter of large moment in large operations, and the use of acid is a matter of constant and considerable expense. By wholly dispensing with both by the use of a minute quantity of hydroxy compounds, the patentee has disclosed an original and novel plan which has broadened and made more simple the agitation process of air flotation. The length of this opinion, rendered necessary in the full discussion of the first patent, is the sufficient warrant for our refraining from a detail discussion of the proofs and reasons which lead to our conclusion as to the novelty and inventive character of Greenway's discovery, and we therefore limit ourselves to stating that after full consideration we have reached the conclusion that his patent is valid, and, for the reasons stated in discussing the first patent, is infringed by the defendant.

It is ordered that the part of the decree of the District Court holding valid and infringed claims 1 and 12, and invalid claim 9, of Letters Patent No. 835,120, and holding valid and infringed claims 1, 2, 5 and 6 of Letters Patent No. 962,678, be affirmed, and that the part holding invalid claims 1 to 12 of Letters Patent No. 1,099,699, be reversed, and that a decree in accordance with this opinion be entered.

BUFFINGTON, Circuit Judge (dissenting). Putting aside all minor incidents, this case in my judgment, involves one broad, basic and far-reaching question, and that is whether any and all advance and improvement in the sphere of air flotation in mineral recovery for the next few years shall be subjected to what will practically be a blanket claim for any use of air as a flotation agency.

The claim which we are asked to construe and apply is for:

"The *herein*-described process of concentrating ores, which consists in mixing the powdered ore with water, adding a small proportion of an oily liquid having a preferential affinity for metalliferous matter (amounting to a fraction of one per cent. on the ore), agitating the mixture until the oil-coated mineral matter forms into a froth, and separating the froth from the remainder by flotation."

I say, putting aside all minor incidents, for it is perfectly clear that if all kinds of air flotation and all kinds and degrees of agitation are covered by this claim, the infringement of the defendants is self-evident by their use of compressed air which produces some agitation and causes air flotation. To my mind, and for reasons I shall now discuss this claim should not be awarded this sweeping scope which will paralyze the subsequent development of a great art.

Now, if any broad right to monopolize all air flotation with a limited use of oil but an unlimited use of agitation exists, it arises by virtue of a contract made between these patentees and the government; and that contract is embodied in the claim of the patentees, made by them and conceded by the government, the other of the contracting parties.

and the consideration for that claim is the required statutory disclosure made by the patentees—

"* * * of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise and exact terms as to *enable any person skilled in the art.* * * * to make, construct, compound, and use the same, * * * and he shall particularly *point out* and *distinctly claim* the part, improvement, or combination which he claims as his invention or discovery."

Turning now to the patent itself, which has been held valid and described by the Supreme Court as "patentable, as new and original as it has been found useful and economical," let us inquire, first, what was the new thing disclosed, for therein we have the consideration for the claim; and, second, what claim was allowed in consideration of such disclosure. This line of approach is to my mind imperative, first, because while an invention may be broader than a claim, a claim can never be broader than an invention. Finding from this claim that it concerns two things, oil and agitation, we must necessarily turn to the specification and there ascertain what was the new disclosure as to oil and agitation. In substance, it was the disclosure of a process in which a hitherto unused minimum of oil and a hitherto unused maximum of agitation were used. Each of these disclosures was summed up by the Supreme Court in these words:

"The process of the patent in suit, as described and practiced, consists in the use of an amount of oil which is 'critical,' and minute as compared with the amount used in prior processes, 'amounting to a fraction of one per cent. on the ore,' and in so *impregnating with air* the mass of ore and water used by agitation—'*by beating the air into the mass*'—as to cause to rise to the surface of the mass, or pulp, a froth, peculiarly coherent and persistent in character, which is composed of air bubbles with only a trace of oil in them, which carry in mechanical suspension a very high percentage of the metal and metalliferous particles of ore which were contained in the mass of crushed ore subjected to treatment. This froth can be removed and the metal recovered by processes with which the patent is not concerned."

It will thus be seen that, first, the quantity of oil; secondly, the character of agitation; and, thirdly, the resultant froth—constituted the disclosure. Apart from the authoritative statement of the Supreme Court as to what was the invention of these patentees, which of course controls us, it is clear, both from the proofs, the physical facts, and a general knowledge of the art, that such was the case, and that this discovery is bottomed on agitation—the new kind of agitation disclosed—which made possible new extension of well-known properties and capacities of oil into fields oil had not reached by any previous methods of agitation. And it follows, if agitation of maximum character is the dominating factor that made possible the use of a minimum of oil, that claims which specify the use of oil and of agitation must not be read in a way that ignores the new and disclosed agitation, which was not only the only specific agitation, but the only generic agitation the patentees disclosed. For it is perfectly clear that, if the art of air flotation to-day had stopped where the disclosure of this specification left it, the only method of air flotation would be

the agitation disclosed in the patent. The specification does not purport to disclose or to make use of any newly discovered property of oil. Let that fact be clearly understood. That oil had three qualities was well known prior to this patent—first, that oil had an affinity for metal particles; secondly, that the oil covering the metal was of infinitesimal thinness; and, third, that oil has no affinity for and will not coat gangue. Such being the known action of oil, viz. its affinity and its capacity for thus thinly coating it, and for not coating gangue, it is manifest that whenever oil, gangue, and metal particles are mixed only a minute quantity of oil was needed to coat and actually did coat the mineral particles. The larger quantities of oil used were not needed or used to coat, but to float, the minerals. These facts are proved by the testimony of Sulman, hereafter quoted and alluded to in the House of Lords opinion, referred to later as an agitation which "assists the process of minute quantities of oil reaching minute particles of metal." But while the small quantity of oil used as a metal covering was a fact, the significance of that fact was not recognized in the preceding practice, for the manifest reason that in such art there was no use of oil alone for metal-covering purposes, but it was used for the double purpose—first, of oil covering; and, second, oil flotation. When, therefore, the patentees disclosed a process in which the oil necessary for flotation was dispensed with, the requirement of a small amount of oil for purely coating purposes became at once apparent and assumed a new significance. This was referred to by the Supreme Court when, in distinguishing it from the prior art, it said:

"The small amount of oil used makes it clear that the lifting force which separates the metallic particles of the pulp from the other substances of it is not to be found principally in the buoyancy of the oil used, as was the case in prior processes," etc.

From these considerations it will be seen that oil required and used for covering or coating the mineral particles, was precisely the same in quantity and function in prior practice and the practice of this patent. But what did happen was that the violence and duration of the agitation brought more particles into contact with oil than when the agitation was less violent. What, then, was the disclosure? This is clearly shown by the patentees in their specifications, where they show the *nature of their improvement* by contrast with the prior practices of the Cattermole patents. These proofs show that the present discovery was made while working on the process disclosed by Cattermole and the specification recites its relation to Cattermole. Turning, therefore, for information to Cattermole's patents, I find Cattermole's process was one where oil was used for the double purpose, viz.: First, such small quantity as was necessary for metal particle covering; and, second, such large quantity as was necessary for metal particle flotation. I say "for metal particle flotation" advisedly, for, while the process finally ended in the metal particles finding their way to the bottom and the gangue to the top, yet, as a necessary precedent step to making the metal particles go to the bottom, they were first floated upward, so as to enable them to *there* nucleate or agglomerate in such

numbers that their combined weight overcame the buoyant capacity of the oil and they sank to the bottom of the vessel. These several actions are set forth by Cattermole, as follows:

"The invention depends upon the application of the following facts: First, when a mixture of powdered metalliferous matter and gangue is treated with oil suspended in water—that is to say, in emulsion—*the oil has more or less selective action and will coat the particles of metalliferous matter in preference to the particles of gangue*, while the particles of gangue will be wetted by the water; second, if the water which is mixed with the oil is acidulated with mineral, fatty, or other acid the *selective action of the oil will thereby* be rendered more marked and decisive; third, if the proportion of oil is kept within reasonably low limits (differing in different cases, according to the nature of the mineral to be treated and the consistency and nature of the oil) and if the mixture of water, oil, metalliferous particles, and gangue be *thoroughly agitated* the metalliferous particles which have become coated with oil will adhere together and form granules, which granules, partly by reason of gravity and partly on account of their bulk, as compared with the individual grains of gangue, will offer ready means for separation in an upcurrent separator, a jig, or other similar appliance."

At this point it should be noted that as the patentees, in order to explain their disclosure, by reference make the Cattermole patent part of their specification, as the agitation used by the patentees was a step in the Cattermole process, and the Supreme Court found the patentees used and disclosed "an agitation greater than and different from that which had been resorted to before," and also that "the extent of the agitation of the mass had been increased as the experiments proceeded until the series of the Gabbett mixers, fitted with the usual baffles, were speeded at from 1,000 to 1,100 revolutions per minute," an inquiry into the character of the new kind of agitation used and disclosed by the patentees becomes essential to a due understanding of the disclosure made. As recognized and stated by the Supreme Court, this agitation consisted in the patentees speeding up a Gabbett mixer to 1,000 to 1,100 revolutions per minute. The extent of the agitation of the mass had been increased as the experiments proceeded until, as stated by that court, the "series of Gabbett mixers, fitted with the usual baffles, were speeded at from 1,000 to 1,100 revolutions per minute." It is apparent that this tremendous agitation speed through a mushy substance like pulp could only be reached by some special appliance impelled by powerful mechanism, since no ordinary paddle mechanism could stand the strain and furnish the power to meet such a requirement. We accordingly find that this was done by the patentees speeding up to hitherto unused speed, the device known and used in Cattermole's process. Instead of seeking to move the whole pulp mass by rotating paddle pressure on the whole mass—a thing which, owing to the length of the paddle required, would be impossible—Gabbett, as shown by his patent No. 444,345, segregated a part of the pulp. This segregated part alone he moved by paddles, and thereby set up a centrifugal force in the pulp in such segregated section, and thus made the centrifugally moving pulp itself the agency for moving the pulp on the outside of this inner dividing vessel. His device was built in two forms, one of which expelled the pulp at the top and the other at the bottom. Referring to the top expelling device,

shown by Figure 1, which, as we shall hereafter see, these patentees necessarily declined to use, its operation is as follows:

"A is a conical shell, having internal ribs $A^2$ and mounted on a shaft B, by which it is suspended within the vessel or tank O, containing the liquid to be acted upon, the shaft being carried at its upper end by a bracket D and guided by a bush or stuffing-box E on the cover of the vessel O. Assuming this vessel to be charged with liquid to the level indicated and the shell A to be rotated by suitable gearing, such as indicated at F, then the body of liquid within the shell being carried round with the same by means of the ribs $A'$ the centrifugal force will cause the liquid to rise along the inclined inner surface of the shell and to be ejected into the surrounding liquid when arriving at the upper edge thereof, while at the same time the pressure of the surrounding column of liquid in the vessel O will cause fresh quantities of liquid to enter the lower end of the shell A to make good the quantity discharged at the top. Thus a continuous circulation and consequent mixing of the liquid will be effected, as indicated by the arrows."

That is, the machine discharged at the top. Its paddles being submerged in the segregated pulp, it could not beat in air. But neither Cattermole, nor the patentees, who adopted Cattermole, used the top *outlet* type of Gabbett's device above described, but did use the other or top *inlet* type shown in Figure 9, although both moved the pulp in the same way, but in opposite directions. Selecting the top inlet or cone type shown in Figure 9 of Gabbett's two forms, although both machines and agitators were, with the exception named, counterparts, there was a functional advantage in the top inlet type used which was vital to the working of the present patentees' process. And that there was a functional disadvantage in the top outlet type which would have been fatal to the working of their patent will, for reasons hereafter stated, be made clear. The only point now made is that the agitation, and the only agitation which the patentees disclosed as embodying the agitation of

their process, was an agitation of one of two particular kinds, namely, one where they utilized their agitation power on a small zone of segregated pulp and where, for functional reasons, as we shall hereafter see, they applied such agitation to this segregated pulp as it was traveling in one direction; that is, downwardly. At this point we recall, as

before stated, that Cattermole's object was to nucleate or agglomerate into a mass, the individual, oil-coated mineral particles, or, as summarized by the Supreme Court, "agglomerating the oil-coated concentrate into granules heavier than water, so that they will sink to the bottom of the containing vessel." As stated in the patent, "the more oil is used, the larger, softer, and less numerous the granules." It was in the use and experimentation of this process that the discovery of the patent in suit was made, and these experiments were duly reported (see volume 4, page 22 and following) from time to time. From these reports it will be seen that the agitator used was of the cone-shape, upper-intake type already described and shown in Figure 9. By March, 1903, they found the value of both violent and protracted agitation, and that such protracted and violent agitation was effective to coat the mineral particles with oil:

"Somewhat *violent* agitation is now required for a *few minutes*; the time being *dependent* upon the *efficiency* of the agitation, and varying from two to five or eight minutes, *whereby* the oil is released from the gangue and *attaches itself exclusively to the mineral.*"

Later, that is, in March, 1904, when a speed of 988 cone revolutions was reached and the effect of agitation effecting air-flotation was noted, where under the head of "Flotation Factor Used," it was said:

"* * * The coarse sands, when passing through the last two mixers, were allowed to be *beaten well with air* by keeping the liquor low in the mixers *and* using *fast agitation*, with baffles in. The concentrates were then found to be floated *up* in the outcast if only a general up current were used."

The underscoring of the words "and" and "up" and the phrase "beaten well with air" and "fast agitation" show that the significance of violent agitation and the entraining of air was in the path of experimentation following the basic feature of the subsequent disclosure of the specification. In March, 1905, under the head "Influence of Peripheral Velocity of Cone"—and it must not be overlooked that "cone" was the word which described the inlet top (Fig. 9) of the Gabbett mixer—it was said:

"An increase in the peripheral velocity of the *cone* causes a decrease in the time required for granulation, a point being reached after which this decrease is slight."

From this entry it will be seen that increase of agitation was still regarded as and was the factor which was leading toward the discovery afterwards made and disclosed in the specification. In the next report both the speed and the type of Gabbett's agitation is again emphasized by contrasting—

First. The low speed of the Gabbett as useless.

Second. The Gabbett *cone* mixer alone and with baffles added as an additional agitation agency.

Third. The inability of a centrifugal pump speeded higher than a Gabbett mixer to furnish the agitation requisite.

These points are all outlined in said report as follows:

"*The influence of the speed and type of agitation* becomes a factor of great importance to our recent experiments. Speeds of rotation (with a small Gabbett) varying from 3 to 500 revolutions per minute, *proved almost useless.*"

This shows the necessity of high speed agitation.

Continuing, the report said:

"We then made a series of baffles which were placed in the Gabbett and which were 'solid'; i. e., they occupied the *greater free space* of the Gabbett vessel from the glass sides up nearly to the working surface of the cone. They were found to be disadvantageous as they gave *too violent* agitation, and set up large eddy currents in front of each baffle, greatly reducing rotation speed of the liquor in the Gabbett and adding *water friction* to such an extent to the rotating cone, that the power required to drive the latter was more than doubled. On replacing these solid baffles by the *ordinary type of thin rod baffles*, the granulation period was much improved, and the power consumed in driving the cone fell again to the normal."

This, to our minds, shows that, although the baffles increased the agitation, they precluded the kind or quantity of agitation desired. Manifestly the stoppage and delay of the pulp in eddies caused by the baffles stopped the steady and more frequent passage of the pulp through the cone, and this lessened the amount of agitation in the segregated zone where the air was beaten in.

Continuing, the report adds:

"We have also carried out a series of experiments with a small centrifugal pump in place of a Gabbett, to determine whether this gives a better form of agitation than the cone. * * * The following figures were obtained by Mr. Leechman yesterday in comparison with the Gabbett, and show the latter to be distinctly preferable to the centrifugal pump experiments. We may say the centrifugal pump used was only a small one, having about a 4½ to 5 inch chamber, but it was speeded up to about *1,200 revolutions per minute. The pump therefore had a considerably higher peripheral speed than* the Gabbett used in parallel tests."

From this it will be seen that by a process of elimination it was becoming evident that the agitation desired was only obtainable on a *cone* or *top outlet* Gabbett mixer, and that the violent agitation by solid baffles and by the higher speed of a centrifugal pump were both objectionable.

In the light of subsequent events, it is quite evident why this was the case. In the first place, the top inlet or cone Gabbett mixer, by the rapidity of revolution formed a hollow air chamber around the shaft, into which air was drawn down and was there beaten by the paddles into and aerated the pulp. It is also clear that if solid baffles were used on the sides of the outer chamber, the rapid flow of the pulp would be measurably stopped and it could not pass as often through the cone, and therefore was not subjected to as much air beating as when the baffles were not used, as manifestly all the air beating in took place in the cone. And lastly, while in the Gabbett mixer the revolving paddles in the cone were able to strike and beat the air into the surrounding pulp, it is evident the blades of the centrifugal pump, *being necessarily wholly immersed in pulp,* had no contact with air or an opportunity to beat air in. In other words, by its blade submerging, the centrifugal pump had no more power or opportunity to beat air into the blade-enveloping pump than would have been the case had the paddle blades of a Gabbett mixer with a *top outlet* (see Figure 1), whose blades would also be wholly immersed in the outflowing stream, been used.

It will here be noted that as the centrifugal pump was the sole form of agitation used in this particular stage of the experiments, and, as it was discarded by the experimenters, that, tested by the acts of these patentees, no logical grounds existed for their counsel now planting themselves on the position that the pulp lift of a centrifugal pump is the air agitation of their disclosure and claim.

In the next report, March 16th, under the head "Influence of the Percentage of Oil," we find the effect of oil reduction is noted:

"The effect of diminishing the percentage of oleic acid is to alter the type of oiling; the higher percentages producing granules. and the lower froth. Six per cent. of the oleic acid on the mineral is sufficient to form good granules without much froth. * * * 0.62 per cent. oleic acid on the mineral is insufficient to form any granules, and nearly the whole of the mineral comes to the surface, on stopping the cone, as froth."

It will thus be seen that it was agitation, and agitation of a selected type and speed, that gradually led up to the May 3, 1905, report, where the invention was definitely recorded. And when this was done it was accredited to the agitation indicated. That report says:

"We beg to hand you herewith a statement of the new method of oil concentration which we have been engaged in investigating and working out in detail, for the purpose of your forwarding to Mr. Courtney and his staff in Australia. It will be best to start with a short statement of the principle on which the process depends. In determining the lowest limit of oleic acid which could be employed in granulating, it was found that granulation practically stopped at a range of about 0.5 per cent. of oleic acid on the mineral (60 mesh Broken Hill), in an acid circuit somewhat below 1 per cent. in strength. A certain amount of black mineral froth was, however, noticed as a result. On successively decreasing the amount of oleic acid *below* 0.5 per cent. it was found that, whereas granulation ceased, there was a growth in the amount of mineral float-froth under these conditions, and that the production of such float-froth appeared to reach a maximum when about 0.1 per cent. of oleic acid on mineral was used. This froth on collection was found to consist of oiled mineral slimes *mechanically holding more or less coarse* (oiled) mineral particles, the froth carrying between 70 to 80 per cent. of the total mineral present in the charge. * * * The froth produced is not due to any action of the acid circuit upon traces of calcite present in the ore; i. e., not to the liberation of any gas in the charge by means of the dilute acid employed in the circuit. It has been located, on the contrary, *to the air introduced by the Gabbett cone during agitation, the air attaching itself to the oiled mineral slimes and to a large proportion of the coarse mineral particles, although both these materials can only be coated with an infinitesimal amount of oil;* i. e., oleic acid. That the formation of froth is due to *air inclusions during the agitation,* and not to carbonic acid or sulphuretted hydrogen is proved by the following experiences: * * * The plant consists of a series of Gabbett mixers fitted with the usual baffles, and speeded at from 1,000 to 1,100 revolutions per minute as regards the cone. These Gabbett mixers are identical in every respect with those used for the original Cattermole process. * * * The operations are therefore summarized as follows: *Gabbett agitation* in the usual way with 0.1 per cent. oleic acid"

—thus themselves coupling with their invention at its birth the name of Gabbett and Gabbett agitation, which they now seek to avoid.

This terse and complete summary of the discovery in *"Gabbett agitation* in the usual way with 0.1 per cent. oleic acid" is also the summary of all that is set forth in the specification of the patent in suit, and further and other than "Gabbett agitation in the usual way with 0.1 per

cent. oleic acid" the long specification discloses no method or suggestion of other agitation, and gave none to the art. Such specification starts with reference to the Cattermole patent, from which we have quoted, Nos. 777,273 and 777,274, and states that in the former:

> "Oil varying from 4 per cent. to 6 per cent. of the weight of metalliferous metal present is agitated with an ore pulp so as to form granules which can be separated from the gangue. * * * We have found that if the proportion of oily substance is considerably reduced—say to a fraction of 1 per cent. on the ore—granulation ceases to take place, and after vigorous agitation there is a tendency for a part of the oil-coated metalliferous matter to rise to the surface of the pulp in the form of a froth or scum."

Such was the discovery the patentees embodied in the two claims here in issue, viz.:

Claim 1:

> "The herein-described process of concentrating ores which consists in mixing the powdered ore with water, adding a small proportion of an oily liquid having a preferential affinity for metalliferous matter (amounting to a fraction of 1 per cent. on the ore), *agitating the mixture until the oil-coated mineral matter forms into a froth, and separating the froth from the remainder by flotation.*"

And claim 12:

> "The process of concentrating powdered ore which consists in separating the minerals from gangue by coating the minerals with oil in water containing a fraction of one per cent. of oil on the ore, *agitating the mixture to cause the oil-coated mineral to form a froth, and separating the froth from the remainder of the mixture.*"

It will be observed that these two claims do not themselves cover any complete, workable process of concentration disclosed in the specification, but are separate steps or elements in the process of workable concentration described in claim 3, which in addition to the above elements includes the elements of acid and heat. And that the extract quoted above, embodied in claims 1 and 12, was not a complete concentration process but merely certain elements or steps of it, is made clear by the patentees, for, after reciting that "there is a tendency for a part of oil-coated metalliferous matter to rise to the surface of the pulp in the form of a froth or scum," they add:

> "This tendency is dependent on a number of factors. Thus the water in which the oiling is effected is preferably slightly *acidified* by adding say a fraction of 1 per cent. up to 1 per cent. of sulphuric acid or other mineral acid or acid salt, the effect of this acidity being to prevent gangue from being coated with oily substance, or, in other words, to render the selective action of the oil more marked. * * * Again, we have discovered that the tendency for the *oily substance to disseminate* through the pulp and the rapidity with which the metalliferous matter becomes coated is increased as the pulp is *warmed.*"

It will thus be seen that the workable concentration process which the patentees gave the art, was one in which the "flotation of mineral particles" was dependent on a number of factors, viz.: First, Gabbett agitation; secondly, 0.1 per cent. of oleic acid; thirdly, 0.1 per cent. sulphuric acid; and, fourth, heated pulp. And the workable process embodied all these four elements used in the method of working the invention, which the patentees necessarily showed in compliance with

the statutory requirements that they "shall file in the Patent Office a written description of the same, and of the manner and process of * * * using it, in such * * * exact terms as to enable any person skilled in the art. * * * to use the same," suggests that they regarded all four elements as constituting their workable process, and indeed they attribute to heat the permeating and rapid coating of the minerals with oil.

Complying with the statutory requirement, the patentees say:

"The following is an example of the application of this invention to the concentration of a particular ore. An ore containing ferruginous blende, galena, and gangue consisting of quartz, rhodonite, and garnet is finely powdered and mixed with water containing a fraction of 1 per cent. or up to 1 per cent. of a mineral acid or acid salt, conveniently sulphuric acid or mine or other waters containing ferric sulphate. To this is added a very small proportion of oleic acid (say from 0.02 per cent. to 0.5 per cent. on the weight of ore). The mixture is warmed, say, to 30° to 40° centigrade, and is *briskly agitated* in a cone mixer or the like, *as in the processes previously cited*, for about *two and one-half to ten minutes*, until the oleic acid has been brought into *efficient contact* with all the mineral particles in the pulp. When agitation is stopped, a large proportion of the mineral present rises to the surface in the form of a froth or scum which has derived its power of flotation *mainly from the inclusion of air bubbles introduced into the mass by the agitation, such bubbles or air films adhering only to the mineral particles which are coated with oleic acid*."

It is urged that this is but a sample method of showing how their process was workable. But the sample element consisted in the particular treatment given to a particular character of ore. It was not a sample of one of many possible kinds of agitation, for the kind of agitation applicable to all kinds of ore was concededly of one sort, namely, as therein stated, "briskly agitated in a *cone mixer or the like*, as in the processes previously cited." And the testimony of those who made the discovery and made the disclosure shows that the way, and the only way, they discovered and disclosed, was a definite kind of agitation, and that this definite kind of agitation made their disclosed process workable. Indeed, that maximum of agitation and minimum of oil, increase of agitation and decrease of oil, were axioms in this process is made clear by the proofs. As the amount of oil was decreased, the amount of agitation had to be increased. In that regard, Sulman, one of the patentees (volume 1, p. 53), says:

"The first requisite of any oil concentration process is to obtain efficient contact between the oil and the mineral and suitable methods must be employed to effect this. Where the oil is in large relative quantity to the mineral, *violent agitation is unnecessary*, and may be very harmful. With decreasing proportions of oil more vigorous agitation or mixing *is necessary to insure such efficient contact of oil with the mineral particles*. The agitation may therefore be said to be roughly proportioned to the work to be done in bringing about contact between large or small quantities of oil in regard to the mineral."

His evidence (page 54) is that in the Gabbett mixer of the cone type he first saw produced the froth of the specification:

"The apparatus that I first saw the agitation froth produced in as described on the specification referred to was the ordinary Gabbett apparatus consisting of a vessel with rotating cone and with suitable baffles. The cone was rotated at a high rate of speed, about 1,000 revolutions per minute."

The use of the ordinary speed of the Gabbett mixer to effect the intermingling of the oil with the mineral particles, and the use of superadded speed for the purpose of entraining air and producing froth, is made clear by the testimony of Picard, another of the patentees. Thus (page 109) in answer to the question:

"Q. In carrying out the process which the patent in suit purports to disclose, is there anything distinctive about the mode of agitation of the oiled pulp as compared with the agitation used in applying the Cattermole process, wherein the purpose is to granulate and precipitate the valuable mineral?"

—Picard says:

"In actual fact the same apparatus was employed for both purposes during my connection with the experimental work on the two processes. In the patent in suit it is *more essential to beat in air*, which is not an important point, and *rather to be avoided*, in the Cattermole process, where the object *was only* to mix the various ingredients, air not being one of them."

And he adds (page 110):

"We already knew from the first test that the cause was due to reducing the quantity of oil much below that hitherto employed, and observation of the froth clearly indicated that the air which had been beaten in played an important and *essential* part in the production of this new phenomenon. I presume that further investigation work was carried on, but in my opinion the invention may be said to have been completed after that first operation. * * * I had no idea, prior to this, that by reducing the quantity of oil to the limits which were used in this experiment that such a result would be obtained. I, of course, knew that air would float mineral, previously oiled; but it was not anticipated by me hitherto that this particular result would be obtained if *air were beaten in*, in the manner in which it was done in making this test."

John Ballot, the third patentee, also emphasizes (volume 1, p. 118) this "intentional beating in of air" caused by violent agitation, where in answer to the question:

"And when you saw the work in progress from March 1, 1905, onwards, as referred to by you in your answer to question 29, was this the first occasion upon which you had been informed as to the use in an oil flotation process of the *intentional beating in of air* for the purpose of promoting flotation?"

—he says:

"*The intentional beating* in of air to produce or promote the flotation of froth which was developed by that process was certainly not known until the fact had been actually discovered by using a very small quantity of oil, say 0.2 or 0.1 per cent., and agitating it for a certain time, and then leaving the mixture to stand that the whole froth rose to the surface. By 'discovered' I mean until the experiments had established the fact that this extraordinary phenomenon was every time reproduced by using the small quantity of oil, *violently agitated*, and then leaving it to stand, when the mineral rose to the surface in the form of dense froth."

He adds:

"We considered it established, and that the principal cause of flotation, or *perhaps the entire cause of flotation*, was *due to air beaten* into the pulp, assisted, of course, by the other agents."

Indeed, the discovery of beating air by agitation into the pulp as the groundwork of the discovery, and therefore of the resultant disclosure, is summed up by the witness Ballantyne (volume 1, p. 225) in the words:

244 F.—50

"After *violent agitation in such a way as to introduce air into the pulp, the agitation lasting several minutes,* the pulp was brought to rest and immediately a coherent and persistent froth rose to the surface. Although I was closely familiar with all the earlier processes of ore concentration in which oil had been used, * * * the production of this agitation froth was to me little short of a miracle."

In this development it will be seen that Mr. Ballantyne makes the violent agitation of the cone mixer the basic step in these words.

But not only was the testimony of these witnesses that this air-beating or air-entraining agitation was the agency which produced a froth of a hitherto unknown type, but we have the authoritative view of the Supreme Court that the *lifting force* of the bubbles is to be found not in the quantity of oil used, but in the maximum of agitation, "greater than and different from that which had been resorted to before." We think the agency of this air-beating-in agitation as the functional cause of air flotation, is made clear by the Supreme Court. In that regard that court says:

"The small amount of oil used makes it clear that the lifting force which separates the metallic particles of the pulp from the other substances of it is not to be found principally in the buoyancy of the oil used, as was the case in prior processes, but that this fact is to be found, chiefly, in the buoyancy of the air bubbles introduced into the mixture by an agitation *greater* than and *different* from that which had been resorted to before and that this *advance* in the prior art and the *resulting* froth concentrates so different from the product of other processes make of it a patentable discovery as new and original as it has proved useful and economical."

In quoting and approving the decision of the House of Lords, 27 R. P. C. 33, the Supreme Court alluded to the dual functional capacity of the patentees' agitation: First, as a mixer of oil with the mineral particles (the function of Gabbett agitation at normal speed); and, secondly, the formation of air cells by air entraining (the function of Gabbett agitation at abnormal speed). The extract thus quoted with approval from the English decision, is:

"They [the patentees of the *Agitation Froth Process* of the patent in suit] are not promoting a method of separation which had been before described, but they are engaged upon a new method of separation. Istead of relying upon the lesser specific quantity of oil in bulk they rely upon the production of a froth by means of an agitation which not only assists the process of *minute quantities* of oil reaching *minute* particles of metal, but *forms a multitude of air cells,* the buoyancy of which air cells, forming around single particles of the metal, floats them to the surface of the liquid."

And that agitation of a particular kind, and not agitation of any kind, was the disclosure of the specification, is shown by Dr. Liebman, who says:

"I believe that 500 or 600 revolutions are quite sufficient for the Cattermole process (metal sinking). But I believe that at least 1,200 revolutions per minute *are necessary* for the process of the patent in suit in the same apparatus."

From the above review, it is clear that the basis of this invention was agitation, and of agitation of a particular type and power, and that such type and kind of agitation gradually led to the further discovery that all oil, except the minimum required for mineral coating, could not be dispensed with. That the invention cannot be based on the

use of a minimum of oil alone is clear, for the stress laid on agitation in the specification, and its presence as an element in the claim here in issue, forbid any such holding, and the further fact that a claim based wholly on the use of a fraction of 1 per cent. of oil for coating minerals was abandoned during the prosecution of the patent, to wit:

"The process of concentrating powdered ore which consists in separating the minerals from gangue by coating the minerals with oil in water containing a fraction of 1 per cent. of oil on the ore, and recovering the oil-coated minerals."

Seeing, then, that no change occurs in the character of the oil itself, in the amount required to coat the metal particles, or the affinity of the particles when coated, it follows that the essence of this patent lies in the agitation by which this low percentage of oil is made available. Now, what was the nature of this agitation? It had a number of characteristics:

First, it was produced by machinery of high power operating on mechanism revolving at high speed. This mechanism was a special type; i. e., a *top-inlet* or *cone* Gabbett mixer which embodied certain features, each of which was necessary to the successful working of the invention disclosed: (a) The application of the mixer to the pulp was confined to such restricted zone of the pulp as was inside the cone; (b) to this cone-restricted zone the air had access; (c) the speed of the agitation was raised to a hitherto unused point; (d) the air in the chamber was by the speed of the agitator beaten into the pulp segregated in the cone; (e) in addition to high speed, time was required, the agitator being revolved from 2½ to 10 minutes before the entrance of air appeared in froth; (f) the agitator was of such novel, individual, and inventive character as to warrant the grant of a patent; (g) the agitator was of such special type and speed that the froth it produced was also of a new type, or, as the Supreme Court said, "utterly different from any froth known before."

But, because the claims here in controversy use the word "agitation," without description or limitation, it is argued that the term should be used in a broad, generic sense, and cover any and every agitation which results in the air flotation of mineral coated particles. Put into practical commercial application, this means a monopoly of the principle of air flotation of oil-coated minerals, with the one exception, namely, where 0.1 per cent. or more of oil is used. To our mind, this use of the literalism and verbiage of this one word "agitation" to foreclose this whole great controversy loses sight not only of the spirit of the patent law, but also of the principles on which this contract—for a contract with the government is what this claim is—should itself be interpreted, for in construing that contract we must construe it as a whole; that is, the claims plus the specification, and not the claims minus the specification. We must also consider the claims in the light of the evolution of experiment that led up to the discovery, and consequently to the disclosure.

It is argued here that no sort of agitation is specified in the specification, that the phrase or idea of beating in air is not even mentioned in the specification, that there is no mention of any specific form of agi-

tation, and that therefore there is no qualification or limitation to be given to the type or kind of agitation. But this loses sight of the fact that the patent is based on the Cattermole process, and that that process and the patentees used a Gabbett mixer, and when the word "agitation" was used in the specification it referred to what the patentees had used in making their discovery, and was well understood by persons versed in the art, and when they spoke of the production of froth by agitation they meant precisely what they reported in their experiments, to wit:

"The froth produced is not due to any action of the acid circuit upon traces of calcite present in the ore; i. e., not to the liberation of any gas in the charge by means of the dilute acid employed in the circuit. It has been located, on the contrary, to the *air introduced by the Gabbett cone during agitation, the air attaching itself to the oiled mineral slimes and to a large proportion of the coarse mineral particles, although both these materials can only be coated with an infinitesimal amount of oil; i. e., oleic acid.* That the formation of froth is due to *air inclusions* during the agitation, and not to carbonic acid or sulphuretted hydrogen, is proved by the following experiences."

It is quite evident not only that this was the precise word and the disclosed sort of "agitation" they had in their minds when they disclosed their discovery. Moreover, we think that courts and judges have held this was the meaning of "agitation." In passing upon the validity of the patent, the Supreme Court explained what the patentee's invention was, and defined the agitation of that discovery as "beating the air into the mass." This beating of air into the mass by the Gabbett mixer being the sense in which that word was used in the specification, and no disclosure or suggestion of any other agitation being made, the burden is certainly on the patentees to show that, when the word "agitation" was used in the claim, it meant anything else than the agitation disclosed in the specification, to wit, that of the Gabbett mixer or its substantial equivalent. For the word "until," in "agitating the mixture *until*," aptly described the "two and a half to ten minutes" of the directions of the specification during which a Gabbett mixer was to be operated before the froth was produced. In so holding, we do not minimize, belittle, or underrate the very important discovery these inventors made. But the great discovery they disclosed was based on two facts—oil of a certain kind, and agitation of a certain kind. The quantity of oil was less than a tenth. The agitation was by beating in the air until a froth came. That was the extent of their discovery, their disclosure, and their claim. Within those limits they are entitled to protection. Beyond that the art has a right to progress and improve.

So regarding the claim, we turn to the defendants' plants, as to first of which, namely, the one in operation when the bill was filed, there can be no question. It is simply a replica of the plaintiff's process, used as a Gabbett mixer, as did Hyde in the case in the Supreme Court, and, so far as it is concerned, infringement, and an accounting should be decreed. But as to the defendants' second plant I cannot agree that the claims in question cover it. I shall not enter into a detailed description of its working, but at present restrict myself to saying that the basic feature of the defendants' process is the sub-aeration of the pulp through the agency of compressed air. There is no air expansion as an agitating agency in plaintiff's process. They beat

no air into the pulp; they introduce compressed air into the pulp, and avail themselves of the instant expansion of that air to form a different kind of bubble from that of the patentees, and they get a different kind of froth. And the crux of the case may, as we view it, be stated in this way: If the defendants were applying for a patent for concentrating ore, which consisted in sub-aerating a mixture of ore and a fraction of 1 per cent. of oil through the agency of compressed air, would such process be anticipated by the plaintiffs? The test of that question is, not whether the product of two processes is the same, but whether the steps of the two processes are substantially the same. Addressing ourselves to that question, I have reached the conclusion that the defendants' process approaches the problem in a wholly different line from the patentees, and, while the result is the same, that result is reached by steps or means acting in a different way and by a different method. Physically the defendants' method substantially and functionally consists in the liberation of air under light pressure, seven pounds' compression, into the pulp mixture. Physically, by the turn of a stopcock this light pressure is turned on, and instantly aeration and bubble forming begins, and agitation follows. The physical difference between the two systems is as striking in its way as it would be if a person, standing on the stern of an ocean steamer and seeing the maelstrom caused by the 100 a minute revolutions of a screw, should be told that these revolutions, the screws themselves, the shaft, and the ship's great engines, could be taken out of the ship, and their places supplied by a tank of air under mild compression. And yet that is just what these defendants have done. They have eliminated, not 100, but 1,000, revolutions a minute of the Gabbett mixer; they have eliminated the shaft, couplings, and power machinery which was necessary to actuate this; and for it they have substituted the stopcock of a tank filled with air under light compression. Defendants have eliminated such a distinctive element of plaintiff's process that it was patented. The physical difference between the means employed is well illustrated in this way: Suppose the owner of the Gabbett agitator were to sue the defendants for infringement by the use of a compressed air apparatus; could an expert be found so rash as to even suggest that the two were substantially equivalent? Not only are the two not mechanical equivalents, but it is evident that in the two processes the Gabbett mixer and the compression tank work on wholly different principles. The Gabbett mixer uses agitation to beat the air in, in order to thereafter produce bubbles; and that only after several minutes' work produces bubbles, and these bubbles only rise after the several minutes' agitation goes on. In other words, in plaintiff's process bubbles are the product of agitation. In the defendants' practice the expansion of the air itself, on its release from compression, at once creates bubbles, and the instant rise of these bubbles to the surface at once sets up agitation. In other words, the defendants' bubble causes agitation, while in the patentees' agitation causes bubbles. In the one there is a gentle agitation of the fluid, caused wholly by the expansion of air when released from compression. In the other there is no expansion of the air; it is simply beaten into the mixture by the action of the arms of the Gabbett mixer. In the plaintiffs' process the agitation forms the air cells,

and only after several minutes' physical exertion; in the defendants' the air, on its release from compression, by its own inherent power, forms the cell, and forms it instantly.

It has been suggested that in defendants' process the air is shot into the mixture like a bullet from a gun, and that there is no difference between shooting air into a mixture with a gun and beating it in with a paddle. But it is manifest that the defendants' practice is not the shooting in of a violent air blast, but is in allowing air under slight compression to escape from such slight compression at the bottom of the tank. To have the compressed air strike the top surface of the pulp would not lead to any bubble introduction, and consequently to no subsequent agitation by rising bubbles, for such bubbles as would be formed would already be near the surface. It will thus be seen that the introduction of compressed air is necessarily made at the bottom of the pulp vessel, and it is also apparent that no such *sub-air* introduction, which characterizes the defendants' process, could be effected by the Gabbett beating in of the air, for in such case the moving blades of the mixer would have to be wholly immersed in water, and, as we have seen heretofore, such immersion forbade the use of the top-outlet form of Gabbett agitation shown in Figure 1. These differences in form and principle, the difference between a hurricane and a zephyr, the spread between the maelstrom action of a swift-moving mechanism and the bubbling, seeping action of air released from compression at the foot of a tank, and then in the case of the Callow cell oozing or seeping its way between the threads of a canvas, are so different in degree of violence and mode of action that one would naturally expect some difference should evidence itself in their product.

And such is the case. In the defendants' process the bubbles rise at once to the surface; but they are so frail that they absolutely require the continuous support of other bubbles. For in case the air is shut off below, and the upward bubble stream stops, those on the surface at once disintegrate. The defendants' bubbles are ephemeral; they are matured at birth; and, like all such creations, lack self-sustaining power. On the other hand, the plaintiffs' bubbles evidence themselves at the surface in a froth which is only formed after from 2,500 to 11,000 revolutions of the mixer (2½ to 10 minutes of 1,000 to 1,100 revolutions), but when so gradually formed are so self-sustaining that they last for days and are so tough that they support a shovel. If the production of such froth by such a protracted and violent agitation was a contribution of inventive and novel worth to ore concentration, and apart from all authoritative decision that is our estimate of the goal it reached, then for another to reach that same goal without making the tough, persistent, shovel-carrying froth, and without using the thousands of revolutions of powerful machinery, absolutely required to produce it, is also a contribution of inventive and equal worth to ore concentration. And the best evidence of its worth, of its simplicity, and of its effectiveness is the fact that the plaintiffs themselves use it and concede its superiority. Concededly valuable as sub-aeration is, it is certain the ore-concentration art never would have had it, if we were dependent on the plaintiff's patent to give it to the art. Not only did the patent in suit not disclose it, but, if anything, their disclosure

pointed away from rather than to the probability of the use of compressed air. Thus in their specification they take pains to avoid the imputation even of using gas as a flotation agency, and ex majore cautela give notice that "it is to be understood that the object of using acid in the pulp according to this invention is not to bring about the generation of gas for the purpose of flotation thereby"—a statement the Supreme Court referred to as evidencing that their work tended not in the line of introduction of gas, but "to the presence of the air introduced into the mixture by the *agitation* which had been resorted to, to mix the oil with the particles of crushed ore."

Indeed, that the use of compressed air with their concentration process was not in the patentees' concept is strikingly shown by the fact that, had they had any such use in view of the power of compressed air to do the work of the Gabbett mixer, their suggestion of the possibility of its use was almost challenged by the use to which they suggested it could be put to in the second and third spitzkasten, where no mixing or separation was required. They there say:

"An alternative method for the recovery of any sunk oiled metalliferous matter which may be deposited in the second and third spitzkasten is as follows: The products suspended in circuit liquor are removed from the spitzkasten and placed in a vessel in which they are submitted to an *additional pressure of air or other gas* of from, say, one to two atmospheres or over. On relief of such pressure the bubbles of air or other gas *so generated* throughout the mass at once sweep to the surface thereof all the metalliferous matter in the form of a froth which can be separated as before. This idea is not claimed broadly in this case, but forms the subject-matter of an application, filed by us on January 9, 1906, serial No. 295,326."

Of course, whatever ideas they had on the subject were embodied in another application, and offered no basis for a claim in this patent; but even this suggested use of compressed air as a flotation agent to these experienced men suggested to them no use of that agency in the process of this patent. It remained for some other engineer, in this case the defendants' experimenter, to discover and disclose it. This view is emphasized by the fact that five years after this patent was applied for, and two years after it became the owner of it by assignment, the plaintiff joined with one Hoover in applying for a British patent for such use of compressed air. In that patent the patentees themselves emphasize the points we have made, saying:

"This method of introducing the gas may have three functions: (I) The *gas* may *bring about* the necessary agitation of the mass. (II) The gas, being in a state of very fine division, is effectively brought into contact with every mineral particle, thus *clearly differentiating the process* from that of the patent where the mechanical stirrers caused the agitation and *thus preceded bubbles,* while here *bubbles preceded and caused agitation.*"

In the patent in suit the mechanical action of the stirrers, kept up for ten minutes, brought about air being brought into contact with the mineral particles, while by the subgaseous process, the gas being in a state of fine division through seeping through the canvas, is, as said above, "brought into contact with every mineral particle." The fact that the present plaintiffs, five years after the grant of the patent, joined Hoover in taking out this patent, in itself shows that it then regarded the sub-air process as one not covered by the patent in suit, and

may well cause a court to hesitate to give a construction to the patent in suit which is at variance with the plaintiffs' conduct in taking out this Hoover patent.

To me it seems clear that the field of discovery the patentees disclosed was not the broad principle of air flotation, for concededly that principle was known before. What they did disclose was an original method of using the broad principle of air flotation in a particular way. That method was by beating air into pulp with a minimum of oil. They showed how the beating in of air could be effected, and they showed a novel froth product as a result of this beating-in process. In their process air was the product of agitation, and not the agitating agent. In their process bubbles did not appear until protracted agitation was ended. Not only was it produced by agitation, but it did not appear until agitation ceased. It will thus be seen that air was in no way an agitation agency in the plaintiffs' process, in its specification, or in its claims; but the agitation disclosed therein was wholly the physical agitation of an extraneous mechanical process. Now, this occupancy of the field of air flotation, novel, useful, and inventive, the plaintiff disclosed and should be awarded. But, by occupying this part of the field, the process of entraining air by mechanical beating in, the plaintiff did not foreclose all further advance in air flotation. Air flotation as a recognized principle was known before this patent, and by discovering one way to utilize that principle the patentees did not bar all other ways of making use of that principle. If they had discovered the broad principle of the capacity of oil to coat minerals and to reject gangue, if they had first discovered the coating of air bubbles with oil, if they had first shown that oil-coated minerals and oil-coated bubbles would unite and rise to the surface, we could regard them as first comers into a newly discovered field, and as entitled to make all further progress in that art servient to those who created it. And while this has been done in some notable instances, it is nevertheless true that even great and notable steps in a great art can be disclosed by patentees without blocking all further progress in that field. In that regard we are admonished by the later rulings of the Supreme Court in patent causes, which began with Westinghouse v. Boyden, that even such a great invention as the instantaneous stoppage of every car on a great freight train, an invention which is at the bottom of the movage of tonnage to-day, did not bar other inventors from showing other means of using air to accomplish the same result. And such holdings as Westinghouse v. Boyden and the like seem to us the true principle which should govern the administration of the patent law, namely, giving full protection to the full limit of the disclosure made, and refusing to extend that limit so as to bar further advance by others. Applying that principle to the present case, I would hold that the step of the process "agitating the mixture until the oil-coated mineral matter forms into a froth" meant the novel air-entraining agitation which the patentees disclosed and did not cover the novel air-releasing agitation which the defendants disclosed.

In accordance with these views, and in support thereof, I am constrained to record my respectful dissent to the opinion of the court.